RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE ___5__/__1__/_13_

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION


RAY A. MALBROUGH,                  CIVIL ACTION
        Appellant                  NO. 2:12-CV-00958

VERSUS

CAROLYN W. COLVIN, ACTING          JUDGE JAMES T. TRIMBLE
COMMISSIONER OF SOCIAL SECURITY,[1]  MAGISTRATE JUDGE JAMES D. KIRK
        Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE
====================================================

Ray A. Malbrough ("Malbrough") filed an application for disability insurance benefits ("DIB") or a period of disability on August 31, 2009, alleging a disability onset date of June 1, 2007 (Tr. p. 106) due to gout (knees, ankles, toes) and arthritis (entire body) (Tr. p. 121). That application was denied by the Social Security Administration ("SSA") (Tr. p. 53).

A de novo hearing was held before an administrative law judge ("ALJ") on September 7, 2010, at which Malbrough appeared with a vocational expert ("VE"). The ALJ found that, although Malbrough suffers from "severe impairments" of "gouty attacks," cervical degenerative disc disease, and left carpal tunnel

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.

syndrome/Raynaud's phenomenon,[2] he is able to perform light work except for work involving more than occasionally climbing ramps and stairs, any climbing of ladders, ropes or scaffolds, more than occasionally balancing, stooping, kneeling, crouching and crawling, more than occasionally engaging in gross manipulation with the non-dominant upper extremity, more than occasionally engaging in overhead work activity, and any concentrated exposure to workplace hazards (machinery, heights, etc.) and temperature extremes (Tr. p. 42).   The ALJ concluded that, although Malbrough is unable to perform his past relevant work as a cement finisher, he can work as a counter clerk, gate guard, or usher, and therefore was not under a disability as defined by the Social Security Act at any time through the date of the ALJ's decision on September 20, 2010 (Tr. p. 45).

Malbrough requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Malbrough next filed this appeal for judicial review of the Commissioner's final decision.   Malbrough raises the following

---

[2] Raynaud's disease is a rare disorder of the blood vessels, usually in the fingers and toes. It causes the blood vessels to narrow when you are cold or feeling stressed. When this happens, blood can't get to the surface of the skin and the affected areas turn white and blue. When the blood flow returns, the skin turns red and throbs or tingles. In severe cases, loss of blood flow can cause sores or tissue death.   MEDLINEplus Health Information: "Raynaud's Phenomenon," *available at* http://www.nlm.nih.gov/medlineplus/raynaudsdisease.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

grounds for review on appeal (Doc. 11):

> 1. The Appeals Council failed to follow its own policies and procedures regarding the receipt of additional evidence.
>
> 2. Malbrough's waiver of the right to counsel is invalid.
>
> 3. The ALJ posited a defective step five hypothetical, and the vocational expert's responses to the defective question are meaningless.
>
> 4. The ALJ's residual functional capacity finding is not supported by substantial evidence.

The Commissioner filed a brief in opposition to Malbrough's appeal (Doc. 12), to which Malbrough replied (Doc. 19). Malbrough's appeal is now before the court for consideration.

## Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(I), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

## Summary of Pertinent Facts

Malbrough was 52 years old at the time of his 2010 administrative hearing (Tr. p. 106), had an eleventh grade

3

education Tr. p. 12), and had past relevant work as a cement finisher (1982-2001) (Tr. p. 139).

## Medical Records

In August 2007, Malbrough was evaluated by Dr. Enrique A. Mendez, a rheumatologist (Tr. pp. 175-179).  Dr. Mendez found Malbrough had a past medical history, since 1980, of gout which had been diagnosed by several doctors, but never confirmed with arthrocentesis or crystal analysis (Tr. p. 177).  Malbrough's gout had been treated with Indocid and other nonsteroidal anti-inflammatory drugs which afforded some relief (Tr. p. 177).  Dr. Mendez also noted a past neck injury from a motor vehicle accident, for which cervical spine surgery had been recommended, but Malbrough had decided to postpone that approach (Tr. p. 177).  Malbrough complained to Dr. Mendez of right knee and ankle pain (Tr. p 177).  Dr. Mendez noted that Malbrough was 5'7" tall, weighed 190 pounds, and his blood pressure was 122/80 (Tr. p. 178).  Dr. Mendez found tenderness with mild effusion in the right knee and his right ankle was tender with mild inflammatory changes (Tr. p. 178).  Dr. Mendez also found Malbrough's gait was antalgic secondary to right knee and right ankle pain (Tr. p. 179), but the ranges of motion in his shoulders, hips, ankles, left knee, and spine were within normal limits (Tr. p. 178).  Dr. Mendez diagnosed gout and hypertension, and prescribed Colchicine .6 mg once a day and, after the episode of gout is controlled, Allopurinol 300 mg a day as a preventive (Tr. p. 179, 171-174).

In February 2009, Dr. Carl W. Nabours, a family medicine

doctor, evaluated Malbrough and diagnosed hyperlipidemia and gout (Tr. pp. 197-198).  Dr. Nabours noted that Malbrough was unable to tolerate Allopurinol and referred him to Dr. Verela (Tr. p. 198).

In June 2009, Malbrough was examined by Dr. Raul E. Varela, a rheumatologist, who diagnosed carpal tunnel syndrome, a history of cervical fracture, probable degenerative joint disease and disc disease with spinal cervical compressive radiculopathy, and degenerative joint disease and probable degenerative disc disease of the lumbosacral spine with lumbosacral compression radiculopathy (Tr. p. 188).  Dr. Varela also found Raynaud's phenomenon in the hands and toes, photosensitive skin rash, GERD, undifferentiated connective tissue disease, possible CREST syndrome, probable degenerative joint disease of the hands and knees, and hip greater trochanter bursitis (Tr. p. 188).  Dr. Varela noted Malbrough's *history* of refractory gout and noncompliance with a low purine diet (to lower his uric acid level) and medication, and found Malbrough was ingesting an increasing amount of beer (Tr. p. 188).  Dr. Varela also noted Malbrough was *currently* taking Allopurinol and Cholchicine, and had not had an acute attack of gout since his last visit (Tr. p. 188).  X-rays (Tr. pp. 183-187) showed degenerative disc disease at L5/S1, the left first metatarsophalangeal (left big toe) with decreased joint space and cystic area probably related to gout, narrowing joints at C2-C6, and degenerative disc disease at C5/C6/C7 with some anterior osteophytes (Tr. pp. 183-188).  Dr. Verela ordered Malbrough to stay off alcoholic beverages (Tr. p. 189).

Also in June 2009, Dr. Nabours continued Malbrough's hyperlipidemia medication (Tr. p. 195-196).  In July 2009, Dr. Nabours continued Malbrough's medication for hypertension and GERD, and found his hyperlipidemia was much improved (Tr. p. 193).

Malbrough underwent a psychological evaluation in November 2010 with Jerry L. Whiteman, Ph.D. (Tr. pp. 219-222).  Dr. Whiteman noted that Malbrough walked slowly with a limp, and displayed sufficient cooperation to provide a valid assessment (Tr. p. 219). Malbrough reported completing the eleventh grade, being socially promoted twice, never repeating a grade, and not receiving special education services; he also reported a history of arrests for a motor vehicle accident, DWI, and theft (Tr. p. 220).  Malbrough was 5'7" tall, weighed 225 pounds (Tr. p. 220), and reported suffering from insomnia (Tr. p. 220).  Ray was last employed in 2007, working for his uncle in construction, where he had worked since 1983 (Tr. p. 220).  Ray reported that he has been married 32 years, assists with household chores, plays cards and dominoes, and cooks out with his friends (Tr. pp. 219-220).  Dr. Whiteman found Ray's general information and long term memory skills are below average, and he had a slow response style during the interview (Tr. p. 221).

On the WAIS-IV IQ test, Dr. Whiteman found that Malbrough had a full scale IQ of 67 (borderline to mild mental retardation), a verbal comprehension index of 70, a perceptual reasoning index of 75, a working memory index of 86, and a processing speed of 59 (Tr. p. 221).  Dr. Whiteman diagnosed pain disorder at Axis I, mild mental retardation v. borderline intelligence at Axis II, gout,

arthritis, and a blood disease (by self report) at Axis III, moderate stressors due to health issues at Axis IV, and a GAF score of 70 at Axis V (Tr. p. 221).[3]   Dr. Whiteman concluded that Malbrough was an overweight, 52 year old male whose cognitive abilities fall on the cusp of mild mental retardation and borderline functioning, that he has had those deficits his entire life and they were evident prior to age 22, and that his ability to adapt to new situation appears to be limited due to both cognitive and physical issues (Tr. p. 222).

Dr. Whiteman also filled out an "ability to do work related activities (mental)" form, and found that Malbrough has slight impairments in his ability to understand and remember short, simple

---

[3] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning ("GAF").  Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system.  The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR").  GAF is a standard measurement of an individual's overall functioning level.  The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness.  The first number indicates the patient's current GAF (a second number indicates the highest score reported in the previous year).  DSM-IV-TR at 32-34.  The GAF scale goes from 0-100, with the 61-70 range representing some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, and has some meaningful interpersonal relationships.  DSM-IV-TR, at 34.  Also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

instructions and to carry out short, simple instructions, and moderate impairments in his abilities to understand and remember detailed instructions, carry out detailed instructions, and the ability to make judgments on simple work-related decisions.. Dr. Whiteman stated he based his assessment on Malbrough's mood disorder associated with his medical condition and on his mild mental retardation (Tr. p.223). Dr. Whiteman also found that Malbrough has moderate impairments in his abilities to interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, and respond appropriately to work pressures in a usual work setting, and has a marked impairment in his ability to respond appropriately to changes in a routine work setting (Tr. p. 224).

<u>September 2010 Administrative Hearing</u>

Malbrough appeared before at his September 2010 administrative hearing without a representative and stated that he waived his right to a representative (Tr. pp. 10-11).

Malbrough testified that he was 53 years old, completed the eleventh grade, did not earn a GED, and last worked in construction, setting forms, pouring concrete, working with an excavator, tying wire, and "hauling stuff" (Tr. p. 12); his job title was cement finisher but he also did some regular construction work (Tr. pp. 27-28). Malbrough testified that he worked for his uncle's construction company from 1985 through 2007; he stopped working because he did not feel like he could work anymore (Tr. p. 13) and his uncle's company went out of business (Tr. p. 14).

Malbrough testified that, when he quit working, his pain and gout attacks affected his ability to walk and stand; now he has pain in his wrists, also (Tr. p. 13).  Malbrough testified that the pain originally started in his left foot, then was in both feet, then also in his knees (Tr. pp. 13-14).

Malbrough testified that he is married, his children are grown, and his wife is a court clerk for the City of Lake Charles (Tr. p. 14).  Malbrough testified they have been living on their savings and what his wife earns (Tr. p. 14).

Malbrough testified that he sees Dr. Nabours every few months, and that after Dr. Nabours started asking him about his diet and drinking, he improved his diet and started drinking a lot less beer (about ten to twelve beers a month) (Tr. pp. 15-17).  Malbrough testified that he has always taken his medication (Tr. p. 17).

Malbrough testified that he has pain when he walks or stands up too long or does something that requires him to get up and down a lot (Tr. p. 16).

Malbrough testified he applied for jobs recently, but the air base job required a lot of stair climbing, and the casino job required a commercial driver's license (Tr. pp. 18-20).

Malbrough testified that he currently takes medication for high blood pressure, Allopurinol, Indocin, Prilosec, Tylenol Arthritis, and Nystatin (Tr. p. 21).  Malbrough testified that he has not seen Dr. Varela in a year because he cannot afford to, and he gets his medications from Dr. Nabours (Tr. pp. 25-26).

Malbrough testified that, during the day, he can cook for a

9

little while (but cannot stand up for a long time), he watches TV, washes and dries clothes, he might drive somewhere if his gout is not flaring up, he occasionally visits neighbors (friends and family) for an hour or two, but he does not socialize too much, and he can no longer fish or shoot pool (Tr. pp. 21-23).  Malbrough testified that he had to quit fishing when his wrists started hurting, but he used to fish once or twice a week (Tr. pp. 23-24).

The VE testified that Malbrough's past work as a cement finisher was heavy,[4] skilled work, SVP-7, and his past work as a construction worker was heavy, semi-skilled, SVP-4[5] (Tr. p. 29).

The ALJ posed a hypothetical question to the VE which involved a person who is 49 years old, with Malbrough's work history and educational background, who can only engage in light work[6] activity

---

[4] "Heavy work" is defined in 20 C.F.R. § 404.1567(d) at "lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds."

[5] SVP, or Specific Vocational Preparation, refers to the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a particular occupation. See Dictionary of Occupational Titles ("DOT"), App. C (rev. 4th ed.1991).  Unskilled work usually requires less than thirty days training, which corresponds to an SVP of 1 or 2; semi-skilled work corresponds to an SVP of 3 or 4; and skilled work requires an SVP level of 5 or higher.  Social Security Ruling 00-4p, 2000 WL 1898704, at *3 (2000).  See also generally 20 C.F.R. § 404.1568.

[6] "Light work" is defined in 20 C.F.R. § 404.1567(b) and § 416.967(c) as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of

and can occasionally climb ramps and stairs, can never climb
ladders, ropes and scaffolds, can occasionally stoop, kneel crouch
and crawl, can occasionally engage in overhead work activity, and
can occasionally engage in gross manipulations with the non-
dominant (left) upper extremity, should avoid concentrated exposure
to workplace hazards such as machinery, heights, temperature
extremes, and humidity (Tr. p. 30).

The VE testified that such a person could work as a gate
guard, which only requires occasional handling (light, semi-
skilled, SVP-3, 9900 jobs in Louisiana), an usher (light,
unskilled, SVP-2, 8845 jobs in Louisiana), a counter clerk, such as
at a photo shop (light, unskilled, SVP-2, 1340 jobs in Louisiana),
or a surveillance system monitor (sedentary, unskilled, SVP-2, 205
jobs in Louisiana).

## ALJ's Findings

To determine disability, the ALJ applied the sequential
process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R.
§416.920(a).  The sequential process required the ALJ to determine
whether Malbrough (1) is presently working; (2) has a severe
impairment; (3) has an impairment listed in or medically equivalent
to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4)
is unable to do the kind of work he did in the past; and (5) can
perform any other type of work.  If it is determined at any step of
that process that a claimant is or is not disabled, the sequential
process ends.  A finding that a claimant is disabled or is not

_____

these activities."

11

disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Malbrough has not engaged in substantial gainful activity since June 1, 2007 (Tr. p. 20), and that he has severe impairments "gouty attacks," cervical degenerative disc disease, and left carpal tunnel syndrome/Raynaud's phenomenon, but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 41). The ALJ also found that Malbrough is unable to perform his past relevant work as a cement finisher (Tr. p. 44).

At Step No. 5 of the sequential process, the ALJ further found that Malbrough has the residual functional capacity to perform the full range of light work except that he can only occasionally climb ramps and stairs, can never climb ladders, ropes or scaffolds, can only occasionally balance, stoop, kneel, crouch, and crawl, can only occasionally engage in gross manipulation with the non-

12

dominant upper extremity, can only occasionally engage in overhead work activity, and should avoid concentrated exposure to workplace hazards (machinery, heights, etc.) and temperature extremes (Tr. p. 42).  The ALJ found that Malbrough is a younger individual with a limited education, and that transferability of work skills was not material in his case (Tr. p. 44).  The ALJ concluded that there are a significant number of jobs in the state economy which Malbrough can perform, such as counter clerk, gate guard, and usher and, therefore, Malbrough was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on August 6, 2009 (Tr. p. 45).

### Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole.  The substantiality of the evidence must

13

take into account whatever in the record fairly detracts from its weight.  <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981).  Also, <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. <u>Dellolio</u>, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

<u>Law and Analysis</u>

<u>Issue 1 - Additional Evidence</u>

First, Malbrough contends the Appeals Council failed to follow its own policies and procedures regarding the receipt of additional evidence.  Malbrough contends he submitted his psychological assessment to the Appeals Council, which shows he meets Listing 12.05,[7] but the Appeals Council failed to consider it as new and

---

[7] See the Listing of Impairments at 20 C.F.R. § 404, Subpart P, Appendix 1.

material evidence (Tr. p. 1).

The Regulations provide a claimant the opportunity to submit new and material evidence to the Appeals Council for consideration when deciding whether to grant a request for review of an ALJ's decision. 20 C.F.R § 404.970(b). For new evidence to be considered material, there must exist the reasonable possibility that it would have changed the outcome of the Secretary's determination." <u>Latham v. Shalala</u>, 36 F.3d 482, 483 (5th Cir. 1994), and cases cited therein. Additionally, to be considered material, the evidence must relate to the time period for which benefits were denied. <u>Johnson v. Heckler</u>, 767 F.2d 180, 183 (5th Cir. 1985). Evidence of a later-acquired disability or a subsequent deterioration of a non-disabling condition is not material. <u>Johnson</u>, 767 F.2d at 183.

New evidence before the Appeals Council is a part of the record upon which the Commissioner's final decision is based. <u>Higginbotham v. Barnhart</u>, 405 F.3d 332, 337 (5th Cir. 2005). If additional evidence is presented while the case is pending review by the Appeals Council, courts of appeals customarily review the record as a whole, including the new evidence, in order to determine whether the Commissioner's findings are still supported by substantial evidence. <u>Higginbotham v. Barnhart</u>, 163 Fed.Appx. 279, 281-82 (5th Cir. 2006). It is of no importance whether the Appeals Council specifically addressed the new evidence in its denial of review. See <u>Higginbotham</u>, 405 F.3d at 338 n. 1 ("[T]he requirement of a detailed discussion was suspended by a memorandum

15

from the Executive Director of Appellate Operations....").

The Appeals Council stated, in its "notice of appeals council action," that it set aside its earlier action of October 26, 2011, denying Malbrough's request for review, to consider the additional evidence he had submitted (Tr. p. 1).  The Appeals Council further stated that it would review Malbrough's case if it "receive[d] new and material evidence and the decision [was] contrary to the weight of all the evidence now in the record" (Tr. p. 1).  The Appeals Council then concluded that the new evidence did not provide a basis for changing the ALJ's decision, and declined to review Malbrough's case (Tr. pp. 1-2).  Therefore the Appeals Council considered Malbrough's new evidence.

Malbrough argues that Dr. Whiteman's report proves he meets Listing 12.05 and that it provided the Appeals Council with a basis to change the ALJ's decision.

A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1.  Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-92 (1990).  Also, Selders v. Sullivan, 914 F. 2d 614, 619(5th Cir. 1990).  Where the impairment is severe, the Commissioner must determine whether the impairment is so severe that the claimant will be presumed to be disabled. This determination is made by comparing the impairment to a specific Listing of Impairments in the SSA regulations.  See 20 C.F.R. § 404, Subpart P, Appendix 1.  If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled.  Cieutat v. Bowen,

16

824 F.2d 348, 351 n.1 (5ᵗʰ Cir. 1987).  Also, <u>Selders v. Sullivan</u>, 914 F.2d 614, 619 n. 1 (5ᵗʰ Cir. 1990).

Listing 12.05, Mental Retardation, states,

"Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
"The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
\*            \*            \*
"C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;...".

Section 12.05(C) defines an impairment to include a valid verbal, performance, or full scale I.Q. score of 60-70, plus a physical or other mental impairment imposing additional and significant work-related limitations of function.  A claimant must prove both of these conditions in order to meet his burden under step three.  <u>Randall v. Astrue</u>, 570 F.3d 651, 657 (5th Cir. 2009), citing <u>Selders v. Sullivan</u>, 914 F.2d 614, 619 (5th Cir. 1990).  Additionally, deficits in adaptive behavior must have manifested before age 22.  <u>Randall</u>, 570 F.3d at 660, citing <u>Crayton v. Callahan</u>, 120 F.3d 1217, 1219 (11th Cir. 1997).  In other words, the claimant must show he has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." <u>Randall</u>, 570 F.3d at 662.  Also, <u>Thompson v. Astrue</u>, 2012 wl 7062342 (E.D.La. 2012) (R&R), report and recommendation adopted, 2013 wl 492357 (E.D.La. 2013).

First, Malbrough must prove his IQ score is sufficiently low.

17

Dr. Whiteman's report shows that Malbrough has a full scale IQ of 67 which manifested before age 22, which fulfills the mental limitation requirement of Listing 12.05(C).

Second, to establish an additional physical limitation, Section 12.00(A), paragraph 4, requires:

> "For [Listing 12.05] paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s) as defined in §§ 141.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are 'severe' as defined in §§ 141.1520(c) and 416.920(c), we will not find that this additional impairment(s) imposes 'an additional and significant work-related limitations of function,' even if you are unable to do your past work because of the unique features of that work."

In the case at bar, the medical evidence showed and the ALJ expressly found that Malbrough's gouty attacks, cervical degenerative disc disease, and left carpal tunnel syndrome/Raynaud's phenomenon are "severe" within the meaning of § 404.1520(c) and <u>Stone v. Heckler</u>, 752 F.2d 1099 (5th Cir. 1985) (Tr. p. 41), and made specific findings as to the work-related limitations of function caused by Malbrough's physical impairments, as set forth above (Tr. p. 42). Therefore, Malbrough has severe physical limitations as required by Listing 12.05(C), in addition to his mental limitation.

Third, Malbrough must show he has deficits in adaptive behavior which manifested before age 22, pursuant to Listing 12.00. Dr. Whiteman's report states "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." That

conclusion is supported by the evidence that Malbrough did not complete high school and was "socially promoted" two times. The Commissioner's argument, that Malbrough's IQ is inapplicable to the period for which he applied for benefits, is directly contradicted by the evidence which proves it has been a lifelong impairment.[8]

The ALJ's findings as to Malbrough's severe physical impairments, together with Dr. Whiteman's evidence that Malbrough's full scale IQ is 67 and his adaptive functioning deficits manifested during Malbrough's developmental phase, prove that Malbrough meets Listing 12.05(C) and is entitled to a presumption of disability.

Since the new evidence shows Malbrough meets Listing 12.05(C), it is both new and material. Therefore, the Appeals Council erred in concluding that Dr. Whiteman's evidence did not change the ALJ's

---

[8] The Commissioner's argument that there was no evidence of Malbrough's mental impairment before the ALJ is also contradicted by the record. At his hearing, Malbrough testified that he only completed the eleventh grade and had twice been socially promoted to the next grade.
   The ALJ erred in failing to further develop that evidence. The ALJ's obligation to develop a full and fair record rises to a special duty when an unrepresented claimant unfamiliar with the hearing procedure appears before him. This duty requires the ALJ to scrupulously and conscientiously probe into, inquire and explore for all relevant facts. The failure of the ALJ to develop an adequate record is not, however, ground for reversal per se. The appellant must show that, had the ALJ done his duty, he could and would have adduced evidence that might have altered the result. Kane v. Heckler, 731 F.2d 1216, 1219-20 (5th Cir. 1984), and cases cited therein. Also, Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991); James v. Bowen, 793 F.2d 702, 704 (5th Cir. 1981). The ALJ has the duty to develop the relevant facts so that he can fully and fairly evaluate the case. James, 793 F.2d at 705. If the ALJ fails in this duty, he does not have before him sufficient facts on which to make an informed decision and consequently the decision is not supported by substantial evidence. James, 793 F.2d at 704.

decision, and in failing to find Malbrough is entitled to benefits pursuant to Listing 12.05.

Since substantial evidence does not support the conclusions of the ALJ and the Appeals Council, their decisions are incorrect as a matter of law, and Malbrough is entitled to a decision in his favor based upon the existing record.  Therefore, Malbrough's case should be remanded to the Commissioner for a calculation of his disability insurance benefits.

Issue 2 – Waiver of Counsel

Malbrough also contends his waiver of the right to counsel was invalid because the ALJ failed to explain the right to counsel at his hearing.

A Social Security claimant is entitled to adequate notice of his right to counsel at a hearing before an ALJ.  The ALJ has a duty to inform the claimant, at the hearing, of the manner in which an attorney can aid in the proceedings, the possibility of free counsel or a contingency fee arrangement, and the limitation of attorney fees to 25% of past due benefits and the required court approval of the fees.  Clark v. Schweiker, 652 F.2d 399, 403 (5th Cir. 1981); Gullett v. Chater, 973 F.Supp. 614, 620 (E.D.Tex. 1997), and cases cited therein.  See also, Brock v. Chater, 84 F.3d 726, 729 n.1 (5th Cir. 1996); Thompson v. Sullivan, 933 F.2d 581, 584-85 (7th Cir. 1991).  Generally, without adequate notice a claimant cannot be held to have validly waived his right to counsel.  However, as in the case of an unrepresented claimant generally, a claimant who does not validly waive his right to

counsel must prove that he was prejudiced thereby in order to merit reversal of the ALJ's decision.   Brock, 84 F.3d at 729 n.1, and cases cited therein.   Pre-hearing written notification alone may be inadequate.  Stansel v. Shalala, 41 F.3d 664, *2 (5th Cir. 664), citing Benson v. Schweiker, 652 F.2d 406, 408 (5th Cir.1981).

At the hearing, the ALJ confirmed that Malbrough had received written notice of his right to counsel from the SSA prior to the hearing, but did not verbally explain the right to counsel at the hearing.  Given the fact that Malbrough meets Listing 12.05(C), he may not have completely understood his right to counsel, and therefore may not have validly waived his right to counsel. However, Malbrough has not shown he was prejudiced by the fact that he was unrepresented at his hearing.  See Brock, 84 F.3d at 729 n.1.

Although Malbrough has successfully raised issues on appeal which require reversal of the Commissioner's decision, those issues all turn on Dr. Whiteman's report, which was not obtained until two months after the administrative hearing was held.   Therefore, Malbrough has not proven prejudice arising from his lack of counsel and reversal is not warranted on that basis.

Issues 3-4 - Residual Functional Capacity

As an alternative argument, Malbrough contends that the ALJ posited a defective hypothetical to the VE, and therefore the VE's responses are not substantial evidence to support the Commissioner's final decision as to his residual functional capacity.  Malbrough is referring to the fact that the ALJ did not

include his mental impairment in the hypothetical to the VE, and the jobs the VE found Malbrough can perform do not take into account his mental impairment.

A claimant's impairments may cause physical or mental limitations that affect what he can do in a work setting. Residual functional capacity is a medical assessment, based upon all of the relevant evidence, of the work a claimant can perform despite his or her limitations. 20 C.F.R. §404.1545, §416.945. Although the burden of proof in a disability case is on the claimant to show that he is unable to perform his usual line of work, once that fact is established, the burden shifts to the Commissioner to show that the claimant is able to perform some other kind of substantial work available in the national economy. Herron v. Bowen, 788 F. 2d 1127, 1131 (5th Cir. 1986), and cases cited therein. Also, Babineaux v. Heckler, 743 F.2d 1065, 1067 (5th Cir. 1984). The Commissioner has the burden to establish a claimant's residual functional capacity. Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995).

For cases at the administrative law judge hearing level, the ALJ has the responsibility for deciding a claimant's residual functional capacity. 20 C.F.R. § 404.1546, § 416.946. The ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities when making his RFC determination. SSR 96-8p. When making the RFC determination an ALJ must consider objective medical facts, diagnoses and medical opinion based on such facts, and subjective evidence of pain or

disability testified to by the claimant or others.  20 C.F.R. §
404.1545(a).

The Fifth Circuit has consistently held that once the ALJ
determines that a claimant suffers from a nonexertional impairment
that prevents him from performing his past relevant work, the
Commissioner must produce expert vocational testimony or other
similar evidence to establish that other jobs exist in the national
economy that the claimant can perform.  Fields v. Bowen, 805 F.2d
1168, 1170 (5th Cir. 1986), and cases cited therein.

The value of a vocational expert is that he is familiar with
the specific requirements of a particular occupation, including
working conditions and the attributes and skills needed.  A
vocational expert is able to compare all the unique requirements of
a specified job with the particular ailments a claimant suffers in
order to reach a reasoned conclusion whether the claimant can
perform the specific job.  Fields, 805 F.2d at 1170.

In the case at bar, the ALJ did not have Dr. Whiteman's
psychological assessment of Malbrough when he evaluated Malbrough's
residual functional capacity.  Therefore, the ALJ was unable to
consider Malbrough's mental impairment and the effect it has on
Malbrough's ability to work, and could not include it in his
hypothetical to the VE.  Consequently, the ALJ's findings as to
Malbrough's residual functional capacity failed to include
limitations caused by Malbrough's mental impairment, and the
hypothetical to the VE was necessarily incomplete because it also
did not include limitations caused by Malbrough's mental

23

impairment.   Therefore, the ALJ's incomplete residual functional capacity assessment and the VE's testimony do not constitute substantial evidence to support the Commissioner's decision that Malbrough is not disabled.

Malbrough also argues the ALJ failed to incorporate his severe impairments of "gouty attacks," cervical degenerative disc disease, and left carpal tunnel syndrome/Raynaud's phenomenon into the hypothetical.   Testimony from a vocational expert is substantial evidence when the testimony is based on a correctly phrased hypothetical question that captures the concrete *consequences* of a claimant's impairments.   Taylor v. Chater, 118 F.3d 1274 (8th Cir. 1997).   In the case at bar, the ALJ correctly incorporated the physical functional limitations *caused by* Malbrough's physical impairments into the hypothetical to the VE.   Since Malbrough has not alleged any additional functional limitations (other than mental) that were not included in the hypothetical, this argument is meritless.

Malbrough further contends the ALJ erred in not obtaining an opinion from a state agency *medical* consultant.   However, since the ALJ did not give any weight to the state agency consultant's opinion (Tr. p. 44), this argument is meritless.

Accordingly, in the alternative, and only if the District Judge finds that Malbrough does not meet Listing 12.05(C), Malbrough's case should be remanded to the Commissioner for re-evaluation of Malbrough's residual functional capacity by the ALJ, and a redetermination by a VE of what, if any, jobs Malbrough can

do given all of his true impairments.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Malbrough's appeal be GRANTED, the final decision of the Commissioner be REVERSED, that Malbrough be AWARDED DISABILITY INSURANCE BENEFITS PURSUANT TO LISTING 12.05(C), and that Malbrough's case be REMANDED to the Commissioner for a CALCULATION OF BENEFITS.

In the alternative, and *only if the District Judge finds that Malbrough does not meet Listing 12.05(C)*, IT IS RECOMMENDED that Malbrough's case be REMANDED to the Commissioner for reevaluation of his residual functional capacity and ability to work.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14)** days **FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 30th day of April 2013.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE